CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★  ＪＡＮ 30 2012  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

U.S. BANK NATIONAL ASSOCIATION, as successor-in-
interest to BANK OF AMERICA, N.A.,  as Trustee for the
Registered Holders of J.P. Morgan Chase Commercial
Mortgage Securities Trust 2007-LDP11 Commercial
Mortgage Pass-Through Certificates, Series 2007-LDP11,

        Appellant,

  -against-

SOUTH SIDE HOUSE, LLC.

        Appellee.

-------------------------------------------------------------------

NO. 11-CV-4135(ARR)


OPINION AND ORDER

ROSS, United States District Judge:

     The U.S. Bank National Association ("USBNA", "the creditor" or "the lender"), as

successor-in-interest to Bank of America, has appealed the bankruptcy court's order dated June

27, 2011, modifying in part the creditor's claim against the debtor, South Side House, LLC

("South Side", "the debtor" or "the borrower"), and disallowing the creditor's claim to more than

seven million dollars in prepayment consideration.  USBNA appeals, arguing that the

prepayment consideration provided for in the loan agreement between the parties constitutes a

claim under the bankruptcy code and should not have been disallowed.  For the reasons set forth

below, the bankruptcy court's order is affirmed.

## I. Background

     U.S. Bank National Association, as successor-in-interest to Bank of America, N.A., as

Trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust

2007-LDP11 Commercial Mortgage Pass-Through Certificates 2007, is the principal creditor of

South Side House, LLC, the debtor in the instant Chapter 11 bankruptcy case. The creditor/debtor relationship arises from debtor's April 2007 execution of a note, mortgage, and assignment of leases and rents (the "Loan Documents"), which were later assigned to the lender.

The Mortgage and Note evidencing the borrower's obligation contain several provisions regarding the consequences of borrower's default. Under Article 4 of the Note, the "Default and Acceleration" explains that the lender can choose to accelerate the debt in the event that the borrower fails to make a timely payment:

> [The Debt shall] without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or before the date the same is due or on the Maturity Date or on the happening of any other default, after the expiration of any applicable notice and grace periods, herein or under the terms of the Security Instrument or any of the Other Security Documents (collectively, an "Event of Default'")

The Loan Documents also include several provisions, particularly relevant here, as to prepayment consideration owed the lender. Under Article 5, the Note is subject to a prepayment premium in the event the borrower attempts to pay off the balance of the loan prior to the termination of the loan. Pursuant to § 5.2(a), the borrower

> at any time after the date which is two (2) years from the first Monthly Payment Date . . . may . . . prepay the unpaid principal balance of [the] Note [, provided the borrower pays] . . ., (a) interest accrued and unpaid on the principle balance . . ., (b) an amount equal to the interest that would have accrued on the amount being prepaid after the date of prepayment through and including the last day of the Interest Period in which the prepayment occurs had the prepayment not been made . . . , and (c) all other sums then due under [the "Loan Documents"] and (d) a prepayment consideration . . . equal to the greater of (i) one percent (1%) of the principal balance . . . being repaid and (ii) the Yield Maintenance Premium.[1]

Therefore, if the borrower seeks to prepay the balance of the loan, the Note protects the lender from the future lost yield resulting from the early termination.

---

[1] The "Yield Maintenance Premium" is derived from a formula aimed at determining the present value of the lender's lost yield and is pegged to the U.S. Treasury Rate. Put another way, the premium seeks to estimate the actual expectation damages to the lender resulting from the borrower's prepayment. See Northwestern Mutual Life Ins. Co. v. Uniondale Assocs., 816 N.Y.S.2d 831, 833 (N.Y. Sup. Ct. 2006). In circumstances in which a lender can relend with little or no transaction costs, the yield maintenance premium may even overcompensate the lender.

Finally, and most importantly for the instant appeal, Section 9.3 of the Mortgage governs

prepayment after an occurrence of default and acceleration:

> Following the Event of Default and acceleration of the Debt, if Borrower or anyone on
> Borrower's behalf makes a tender of payment of the amount necessary to satisfy the Debt
> at any time prior to foreclosure sale (including, but not limited to, sale under power of
> sale under this Security Instrument), or during any redemption period after foreclosure,
> (i) the tender of payment shall constitute an evasion of Borrower's obligation to pay any
> prepayment consideration or premium due under the Note and such payment shall,
> therefore, to the maximum extent permitted by law, include a premium equal to the
> prepayment consideration or premium that would have been payable on the date of such
> tender had the Debt not been so accelerated, or (ii) if at the time of such tender a
> prepayment would have been prohibited under the Note had the Debt not been so
> accelerated, the tender of payment shall constitute an evasion of such prepayment
> prohibition and shall, therefore, to the maximum extent permitted by law, include an
> amount equal to the greater of (i) 3% of the then principal amount of the Note and (ii) an
> amount equal to the excess of (A) the sum of the present values of a series of payments
> payable at the times and in the amounts equal to the payments of principal and interest
> (including, but not limited to the principal and interest payable on the Maturity Date (as
> defined in the Note)) which would have been scheduled to be payable after the date of
> such tender under the Note had the Debt not been accelerated, with each such payment
> discounted to its present value at the date of such tender at the rate which when
> compounded monthly is equivalent to the Prepayment rate (as defined in the Note), over
> (B) the then principal amount of the Note.

In November 2008, the debtor defaulted on the Loan Documents by failing to make the

monthly payment, or any subsequent payments thereafter. In January 2009, the lender

accelerated the debt under Article 4 of the Note and brought a foreclosure action in this court

before the Honorable Brian M. Cogan, United States District Judge. In April 2009, Judge Cogan

granted lender's motion for summary judgment. Before the court appointed a master to compute

damages, the debtor commenced the instant bankruptcy case on April 30, 2009, staying the

foreclosure proceedings.

On June 17, 2009, the Lender filed a proof of claim with respect to the instant bankruptcy

petition for the amount of $36,833,639.68. The total included a claim for "prepayment

consideration" under the Loan Documents for $5,954,395.26, subsequently recalculated

following discovery to $7,481,665.87. Debtor filed a motion objecting to, in addition to other claims not relevant to the instant appeal, lender's claim for prepayment consideration. On June 27, 2011, the Honorable Elizabeth M. Stong, United States Bankruptcy Judge, issued an order and memorandum granting in part debtor's objection, and denying lender's claim for prepayment consideration. In re South Side House, LLC, 451 B.R. 248 (Bankr. E.D.N.Y. 2011). The bankruptcy court reasoned that under New York law the prepayment consideration provision in Section 9.3 of the Mortgage does not create a "right of payment" on behalf of the lender because the provision did not make prepayment consideration due upon default and acceleration alone. Instead, the court reasoned, the right of payment is triggered only when, after default and acceleration, the borrower tenders payment in satisfaction of the owed debt. Because the borrower never tendered any payment in satisfaction of the principal debt, the bankruptcy court disallowed lender's claim for prepayment consideration. USBNA now appeals, arguing that the effect of the borrower's default and the triggering of the acceleration clause created an obligation on the part of the borrower under the Mortgage to pay the prepayment consideration in order to redeem its property. This obligation, appellant argues, constitutes a contingent "right of payment" and a pre-petition "claim" that should have been allowed under the Bankruptcy Code.

## II. Discussion

### A. Standard of Review

On appeal, a district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions of law de novo. In re Overbaugh, 449 F.3d 125, 129 (2009). Asbestosis Claimants v. United States Lines Reorganization Trust (In re United States Lines, Inc.), 318 F.3d 432, 435 (2d Cir. 2003); see also Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous,

4

and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). "Mixed questions of law and fact are reviewed de novo. Matters left to the court's discretion are reviewed for abuse of discretion." In re Hirsch, 339 B.R. 18, 24 (E.D.N.Y. 2006) (internal citation omitted).

      B. A "Claim" Under the Bankruptcy Code

Under Section 502(b) of the Bankruptcy Code, a "court, after notice and a hearing shall determine the amount of [a] claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount. 11 U.S.C. § 502(b). A "claim," in turn, is defined as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5(A). Courts have interpreted "claim" broadly and to "encompass any possible right to payment." In re Mazzeo, 131 F.3d 295, 302 (2d Cri. 1997); see also S.Rep. No. 95-989 at 22 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5808 ("By this broadest possible definition . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case."). The broad definition of claim serves the purpose of requiring that "all those with a potential call on the debtor's assets, provided the call in at least some circumstances could give rise to a suit for payment, come before the reorganization court so that those demands can be allowed or disallowed and their priority and dischargeabilty determined." In re Kings Terrace Nursing Home & Health Related Facility, 184 B.R 200, 204 (S.D.N.Y. 1995) (citing In re Chateaugay, 944 F.2d 997 (2d Cir. 1991)). By collecting all possible claims before the bankruptcy court for potential discharge, the debtor is provided with the "opportunity for a fresh start." Pearl-Phil GMT (Far East) LTD v. Caldor Corp., 266 B.R. 575, 580 (S.D.N.Y. 2001). A claim, however, will not be allowed to the

extent that it is unenforceable under any agreement or applicable nonbankruptcy law, or to the extent it is deemed "unmatured interest." 11 U.S.C. §§ 502(b)(1)-(2).

"[A] valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." Chateaugay, 53 F.3d at 497. To determine whether the claimant possesses a right to payment, the court looks to state law. See Travelers Cas. & Sur. Co. of Am v. Pac. Gas. & Elec. Co., 549 U.S. 443, 451 (2007) ("[W]hen the Bankruptcy Code uses the word 'claim'—which the Code itself defines as a 'right to payment,' 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law."); accord Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law."). The time at which a claim arises—i.e. whether the claim arises pre- or post-petition—is determined as a matter of federal bankruptcy law. Pearl-Phil, 266 B.R. at 581. "In the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" In re Chateaugay Corp, 944 F.2d 997, 1004 (2d Cir. 1991) (quoting In re All Media Properties, Inc., 5 B.R. 126, 133 (Bankr. S.D.Tex. 1980), aff'd, 646 F.2d 193 (5th Cir. 1981)). "A claim will be deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – a right to payment – under the relevant non-bankruptcy law." Ogle v. Fidelity & Deposit Co., 586 F.3d 143, 147 (2d Cir. 2009).

6

C. Prepayment Provisions Under New York law

As Judge Stong lays out in her opinion below, a prepayment consideration provision derives from "well-settled law" and serves the goal of protecting the lender from the losses associated with a borrower prepaying its loan prior to the loan's maturity date. South Side House, 2011 WL 2550796, at *13-14. Under New York common law, the "rule of perfect tender in time" prohibits the early payment of a loan under the rationale that the "lender or mortgage investor has the absolute right to rely upon the income stream contracted for over the life of the loan." Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs., 11 Misc. 3d 980, 984 (N.Y. Sup. Ct. 2006).

Prepayment consideration, or prepayment "premiums," in loan agreements serve to memorialize the rule of perfect tender by essentially agreeing ahead of time upon a cost of prepayment. New York law typically regards prepayment consideration provisions as analogous to vesting an option with the mortgagor; i.e. the mortgagor has the right to buy out the remainder of the loan in exchange for the prepayment consideration. See George J. Nutman, Inc. v. Aetna Bus. Credit, Inc., 115 Misc 2d 168, 169 (N.Y. Sup. Ct. 1982) (noting that prepayment options "are included in mortgage agreements strictly for the benefit of the mortgagor and . . . will be enforced according to their terms"); see also Northwestern, 816 N.Y.S. 2d at 835 ("When a prepayment clause is included as part of the loan obligation, it is generally analyzed as an 'option' for alternative performance on the loan and any premium is deemed consideration or a quid pro quo for the option."). In the case of a voluntary prepayment, therefore, the prepayment provision provides the purchase price for the borrower's option. Here, Article 5 of the Note sets forth the prepayment consideration: after two years,[2] South Side may prepay the principal and

---

[2] This is referred to as a "no call" period, during which exercising prepayment pursuant to the agreement is prohibited.

other charges, provided it pays a prepayment consideration as calculated in the agreement. This option, to be exercised by the borrower, protects the lender from losing the projected income streams of the loan.

Generally, a lender forfeits the right to a prepayment consideration by accelerating the balance of the loan. See In re 400 Walnut Associates, L.P., 2011 WL 5024289, at *11 (Bankr. E.D.Pa. October 20, 2011). The rationale commonly cited for this rule is that acceleration of the debt advances the maturity date of the loan, and any subsequent payment by definition cannot be a prepayment. Id. (collecting cases); In re Solutia Inc., 3790 B.R. 473, 487-88 (Bank. S.D.N.Y. 2007); In re Granite Broadcasting Corp. 369 B.R. 120, 144 (Bankr.S.D.N.Y. 2007); see also Scott K. Charles, Emil A. Kleinhaus, Prepayment Clauses in Bankruptcy, 15 Am. Bank. Inst. L. Rev. 537, 547 (2007) ("If a lender attempts to coerce immediate repayment of a debt . . . , there is a strong argument that the lender has waived whatever entitlement it may have had to collect a fee or damages on account of a voluntary prepayment."). By accelerating the debt owed, a creditor's "actions establish[] that it preferred, sensibly no doubt, accelerated payment over the 'opportunity' to earn interest from the . . . loan over a period of years." In re LHD Realty Corp, 726 F.2d 327, 331 (7th Cir. 1984).

Courts recognize two exceptions to this rule: (1) where the debtor intentionally defaults in order to trigger acceleration and evade the prepayment premium; and (2) when a "clear and unambiguous clause . . .calls for payment of the prepayment premium." Northwestern, 816 N.Y.S.2d at 836. This rule not only ensures that courts will enforce no more than the clear agreement between the parties but sounds in common sense and basic fairness. As Justice Parga explained in his thoughtful analysis of the history of prepayment clauses, a prepayment premium (beyond the actual damages) may be necessary to make whole the lender in the case of a

voluntary prepayment. See generally id. at 835. Presumably, a borrower's intentional prepayment occurs because the market for money is lower than the rate on the note, and the borrower can refinance at a more favorable rate. In the depressed market, the lender, in addition to the costs of replacing the loan, also suffers the consequences of relending at a lower rate than bargained for. On the other hand, where a prepayment is involuntary, such as the result of a default or a public taking, the lender could presumably relend at the same or higher rate, mitigating the lender's damages. Awarding a prepayment premium then might result in a windfall for the lender, who rightfully bears some of the risk of a borrower's default. Accordingly, courts have held that prepayment consideration will not be enforced after default and acceleration unless either the borrower intentionally evaded the prepayment premium or "clear contract language requires it." Id. at 836.

> D. Section 9.3 of the Mortgage is Not a Clear and Unambiguous Expression of the Parties' Intent to Call for the Payment of the Prepayment Premium Upon Default and Acceleration

The question before the court is whether Section 9.3 of the Mortgage is an unambiguous requirement that the lender has a right to prepayment consideration following an event of default and acceleration. USBNA concedes in its brief that absent default and acceleration, the prepayment clause set forth in Article 5 of the Note merely grants the borrower an "option" to prepay the balance of the loan provided it pays the prepayment premium. Therefore, absent default and acceleration, prepayment is best thought of not as a "right to payment" vesting with the lender, but a right of the borrower to buy out his loan subject to some consideration. As a right of the borrower, the prepayment consideration would not be included as a pre-petition "claim" under the Bankruptcy Code. Just as a vendor would have no "claim" for the cost of goods not ordered by a customer—even though a foreseeable contingency exists whereby the

customer could order the goods—the mortgagee has no "claim" for the cost of the a mortgagor's unexercised prepayment option. The prepayment consideration is a cost, not an obligation. The issue before the court, however, does not concern a voluntary prepayment option exercised prior to default. Rather, the question is whether, under the Mortgage, the borrower's default and acceleration vested with the lender a "right to payment" as to the prepayment consideration. In other words, does the event of a default and acceleration transform the prepayment consideration from the cost of the mortgagor's right to exercise an option into the mortgagee's right to payment subject to a contingency?

Appellant makes three separate but related arguments. First, USBNA argues that simply by its terms Section 9.3 of the Mortgage, unlike Article 5 of the Note, creates an obligation of the borrower upon default and acceleration to pay the prepayment consideration subject to a contingency. Second, appellant contends that because Section 9.3 requires the tender of prepayment consideration in the event of the borrower's redemption, following default and acceleration, the borrower's only means of retaining its property is to also tender the prepayment consideration. This "pay or else" scenario, appellant urges, transforms the prepayment consideration from an option into an obligation. Third, appellant argues that under New York law, the prepayment consideration set forth in Section 9.3 would be included in a foreclosure judgment. Because, appellant contends, the foreclosure judgment sets forth the obligations due under the Mortgage, inclusion of the prepayment consideration in the judgment indicates the law's recognition that the lender has a right to its payment.

### 1. Section 9.3 By Its Terms Does Not Create an Obligation to Tender Payment of the Prepayment Consideration but Merely Protects the Lender from Borrower's Intentional Evasion

Appellant argues that the event of acceleration vests the lender with a right to the

payment of the prepayment consideration subject to a contingency.  Appellant contends that because contingent, even remote, rights to payment are included under the broad definition of bankruptcy "claim," the prepayment consideration should be included.  According to appellant, the bankruptcy court erred by focusing on when, or whether, the prepayment had actually become "due."  Instead, appellant concludes, the contingency—that the borrower would satisfy the debt owed on the mortgage subsequent to the initiation of the foreclosure proceedings—even if remote, required the court to include the prepayment consideration as a pre-petition claim.  Appellant's reading of Section 9.3 of the Mortgage is flawed.

The function of Section 9.3 of the Mortgage is essentially to protect the lender when the debtor attempts to evade the prepayment consideration terms by defaulting and tendering payment after acceleration.  In other words, in the event of borrower's evasion, Section 9.3 restores the parties to the prepayment terms of Article 5.  Viewed in this manner, Section 9.3 does not vest any "right to payment" with the creditor; instead, it deems exercised the borrower's option to prepay in the event of an evasion. The terms of the agreement make this clear.  Section 9.3 provides, in part, that upon the event of default, the tender of payment of an "amount necessary to satisfy the Debt at any time prior to foreclosure sale . . . or during any redemption period after foreclosure . . . shall constitute an evasion of Borrower's obligation to pay any prepayment consideration or premium due under the Note." (emphasis added).  Put another way, the contract does not give the lender the right to demand payment of the principal, accrued interest, and prepayment consideration subsequent to a default and acceleration.  Instead, the agreement gives the lender the right to demand immediate payment of the principal and the amount otherwise due under the note, and, if the borrower chooses to satisfy the entirety of the debt, the borrower must furnish the prepayment consideration.  "[T]he language here does no

more than anticipate and thwart any attempt by a mortgagor to intentionally trigger acceleration in order to secure the benefits of prepayment in a favorable market while at the same time avoiding the bargained for premium." Northwestern, 816 N.Y.S. 2d at 839. The provision, therefore, is not an agreement to make prepayment consideration due upon default, but instead provides additional protection to the lender in the event of an intentional evasion. In the event of a default and subsequent payment of the entire debt owed by or on behalf of the debtor, the clause "eliminates the need to prove that prepayment after acceleration is an intentional avoidance of the premium." Id. at 990. Rather, such a subsequent repayment in satisfaction of the debt is automatically deemed an intentional avoidance. Because the instant provision exists merely to restore the Note's prepayment terms in the event of an intentional evasion, the court finds no reason to convert the prepayment consideration from an "option" at the sole discretion of the borrower into a form of liquidated damages that can be demanded by the lender.

The court's survey of cases which have allowed prepayment consideration to be included in a creditor's bankruptcy claim support this conclusion. For example, in 400 Walnut Associates, L.P., the court permitted prepayment premiums where the Note provided that "[u]pon Lender's exercise of any right of acceleration . . . Borrower shall pay to Lender, in addition to the entire unpaid principal balance outstanding . . . (B) the prepayment premium calculated pursuant to Schedule A"). 2011 WL 5024289, at *11; see also In re United Merchants and Mfrs., Inc., 674 F.2d 134, 140 (2d Cir. 1982) (enforcing prepayment clause where note required that upon default, along with accrued interest and principal, "an amount equal to the pre-payment charge that would be payable if [the borrower] were pre-paying such Note at the time" would become "due and payable"). In re CP Holdings, 332 B.R. 380, 385-86 (W.D. Mo. 2005), aff'd, 206 Fed.Appx. 629 (8th Cir. 2006) (permitting prepayment premium claim where

the operative note explicitly provided that default and acceleration obligated borrower to remit a prepayment premium even absent borrower's actual attempt to prepay); In re Vanderveer Estates Holdings, Inc., 283 B.R. 122, (Bankr. E.D.N.Y. 2002') (permitting claim where note required a Yield Maintenance Premium in connection with any prepayment, "whether the prepayment is voluntary or involuntary (in connection with holder hereof's acceleration of the unpaid principal balance of this Note) or the Instrument is satisfied or released by foreclosure (whether by power of sale or judicial proceeding), deed in lieu of foreclosure or by any other means."). In all of these cases, the lender's right to a prepayment premium unambiguously arises as a consequence of the default and acceleration. The prepayment premium, instead of being forfeited by the acceleration of the note, becomes a form of liquidated damages that the lender may demand after accelerating the debt. Where, as here, the Note and Mortgage do not unambiguously require a prepayment premium upon acceleration and default, a claim for prepayment consideration must be disallowed. See, e.g., In re Premier Entm't Biloxi LLC, 445 B.R. 582, 627 (Bankr. S.D. Miss. 2010) (applying New York law and finding that the agreement "[did] not include language that expressly preserves the right of the Noteholders to collect a premium after acceleration"); Solutia, 379 B.R. at 478; cf. Northwestern, 816 N.Y.S. 2d at 837 ("Here it is not default and acceleration which causes the prepayment premium to become due and payable. Instead, 'prepayment' is the predicate for a claim to the premium, albeit when it is attempted after default and acceleration."). These cases make clear that if the parties intended to create an actual right to payment of the prepayment consideration upon default and acceleration, the parties could easily have so contracted.[3]

---

[3] As Judge Stong noted, this conclusion is reinforced by the default and acceleration provision of the Note, Article 3, which defines the debt that becomes due upon acceleration. This provision includes the principal, the interest, and other costs, but does not include prepayment consideration.

## 2. The Borrower Is Under No Obligation to Redeem Its Property Subsequent to Foreclosure Proceedings

Notwithstanding the fact that the Loan Documents fail to unambiguously provide for the borrower's obligation to tender payment of the prepayment consideration in the event of a default and acceleration, appellant urges that the "pay or else" nature of the provision effectively creates an obligation on the part of the borrower, and therefore a right to payment. Under Section 9.3, the prepayment consideration contemplated in the Note becomes due if the borrower "makes a tender of payment of the amount necessary to satisfy the Debt at any time prior to foreclosure sale . . . or during any redemption period after foreclosure." Mortgage § 9.3.   Under the terms of the Mortgage then, if the borrower attempted to redeem the property prior to the foreclosure sale, the prepayment consideration would immediately become due and payable. Because under no circumstances can the borrower redeem its property without also paying the prepayment consideration, appellant argues, the prepayment consideration is no longer an option but an obligation owed the lender. In support of its argument, appellant analogizes the prepayment consideration to a monthly mortgage payment: just as the borrower has an obligation to pay the monthly mortgage payment or lose the property, subsequent to acceleration, the borrower has an obligation to pay the prepayment consideration or lose the property.  While superficially compelling, appellant's analogy misses the mark.

The equity right of redemption is precisely that: a right of the mortgagor that may or may not be exercised.  See Mackenna v. Fidelity Trust Co. of Buffalo, 184 N.Y. 411, 415 (1906) ("[Redemption is the] right to pay the mortgage as soon as it is due and relieve his lands from the lien thereon."). Unlike a monthly mortgage payment, the borrower has undertaken no obligation under the Loan Documents to redeem its property after foreclosure.  While the consequences

14

may be the same—the mortgagor loses its property if it does not also pay the redemption price and the triggered prepayment consideration—this difference is crucial.  The prepayment consideration, even after default and acceleration, remains the cost of the borrower's exercise of its option to prepay the mortgage. Subsequent to acceleration, this option is deemed exercised through the borrower's payment in satisfaction of the loan, such as by redeeming the mortgage. Critically, the borrower is under no obligation to fulfill the condition precedent that would create the lender's right to payment of the prepayment consideration.  The prepayment consideration, therefore, despite its "pay or else" character, remains an unexercised option, and is therefore not a "right to payment"—such as a regular monthly payment or the accrued interest—constituting a claim under the Bankruptcy Code.

### 3. Under New York law, the Prepayment Consideration Would Not Be Included in a Foreclosure Judgment

Finally, appellant argues that under New York law, and specifically under the rule set forth in the Northwestern case, the foreclosure judgment—currently stayed by the bankruptcy petition—would include the prepayment consideration set forth in Section 9.3.  Because, appellant contends, the judgment of foreclosure sets forth the entire amount owed under the mortgage, it follows that a court's inclusion of the prepayment consideration in the judgment indicates the borrower's obligation to pay the consideration.  Though it is not necessary to conclude that the prepayment consideration would be included in the foreclosure judgment to find that it constitutes a pre-petition "right to payment" under the Bankruptcy Code, appellant contends that it is sufficient.  Because the court finds that under the circumstances the prepayment consideration would not be included in a foreclosure judgment, the court rejects appellant's argument.

First, the court notes that the Section 9.3 of the Mortgage very much resembles the

provision that the court in Northwestern found did not indicate the parties intended the prepayment premium to be included in a foreclosure judgment. 816 N.Y.S.2d at 840. In Northwestern, the New York Supreme Court found that the prepayment provision at issue failed to provide that default and acceleration alone triggered its application, and concluded that the foreclosure judgment therefore should not include the prepayment premium. The provision at issue in Northwestern read in relevant part:

> In the event of a prepayment of this note following (i) the occurrence of an Event of Default . . . followed by the acceleration of the whole indebtedness evidenced by this note . . . such prepayment will constitute an evasion of the prepayment terms . . . and be deemed to be a voluntary prepayment . . . and such payment will, therefore, . . . include the prepayment fee required under the prepayment in full privilege recited above . . . (emphasis supplied). Id. at 834.

In reaching its conclusion, the court focused on two key terms: "in the event of a prepayment" and "evasion." Id. at 839. The first term indicated that default and acceleration alone did not trigger the prepayment fee, but it would only become due if the borrower prepaid the debt after acceleration. See id. at 837 ("Here it is not default and acceleration which causes the prepayment premium to become due and payable. Instead, 'prepayment' is the predicate for a claim to the premium, albeit when it is attempted after default and acceleration.").[4] Further, the court reasoned, the explicit acknowledgement that such prepayment would be deemed an "evasion" indicated that the parties meant "no more than [to] anticipate and thwart any attempt by a mortgagor to intentionally trigger acceleration in order to secure the benefits of prepayment in a favorable market while at the same time avoiding the bargained for premium." Id. Therefore, the clause existed only to protect the lender from the borrower's intentional evasion

---

[4] Indeed, in the Northwestern court's comprehensive examination of cases in which prepayment premiums would be included in a foreclosure judgment, every provision called either for the premium to become automatically due upon default and acceleration alone or due upon the option of the lender where "solely the default and acceleration . . .permit[ted] its exercise." Id. at 837-839 (surveying cases). Here, the right to prepayment consideration only becomes "triggered" by the borrower's exercise of an optional right.

of the prepayment premium, not to impose a penalty on the borrower in the event of a default

and acceleration. The parties used similar language here: "if Borrower . . . makes a tender of

payment of the amount necessary to satisfy the Debt at any time prior to foreclosure sale . . . or

during any redemption period after foreclosure, (i) the tender of payment shall constitute an

evasion of Borrower's obligation to pay any prepayment consideration or premium due under the

Note." (emphases added). As in Northwestern, the trigger event of the obligation to pay the

prepayment consideration is not default and acceleration of the loan, but the borrower's actual

tender of payment of the amount due under the loan.

Appellant argues Section 9.3 differs substantially from the provision in Northwestern in

that it expressly provides for enforcement of the prepayment consideration in the event of

borrower's exercise of redemption. Compare id. at 839 ("If the word 'prepayment' . . . was

intended to include 'redemption' in the context of foreclosure, it would be expressly included . . .

."). In other words, appellant argues, because the parties made clear that the prepayment

provision may be enforced even after the judgment of foreclosure and during the period of

redemption, the prepayment consideration should be included in the foreclosure judgment. In

support of this argument, appellant contends that Section 9.3 is virtually identical to the

hypothetical model clause discussed in Northwestern, pursuant to which the court concluded the

prepayment consideration would "be enforced in a foreclosure proceeding and [not be] limited to

'prepayment' situations after acceleration." Id. at 838. That provision read:

> Any tender of payment by Borrower or any other person or entity of the Secured
> Indebtedness, other than as expressly provided in the Loan Documents, shall constitute a
> prohibited prepayment. If a prepayment of all or any part of the Secured Indebtedness is
> made following (i) an Event of Default and an acceleration of the Maturity Date, (ii) the
> application of money to the principal of the Loan after a casualty or condemnation, or
> (iii) in connection with a purchase of the Property or a repayment of the Secured
> Indebtedness at any time before, during or after, a judicial or non-judicial foreclosure or
> sale of the Property then to compensate Holder for the loss of the investment, Borrower

shall pay an amount equal to the Prepayment Fee. Id.

Appellant relies on the similarities between the model clause and Section 9.3 of the Mortgage clause but ignores the critical differences. It is true that, as in the model provision, Section 9.3 contemplates prepayment "any time prior to . . . or during any redemption period after foreclosure." (emphases added). The possibility of prepayment consideration therefore survives the initiation of foreclosure proceedings. As in the model clause then, and unlike the principal clause at issue in Northwestern, the borrower's redemption following foreclosure would trigger the obligation to the pay the prepayment consideration.[5] The Northwestern court, however, focused critically on the language in the model clause stating that the prepayment fee would become payable upon a premature payment "by anyone and at any time." Id. This includes third-party purchasers at foreclosure sales. Under the model clause then, in every scenario subsequent to a default and acceleration—before, after, or during foreclosure—any resolution of the mortgage would necessarily constitute a prohibited prepayment and trigger the right to the prepayment fee. Therefore, under the model clause, default and acceleration effectively triggers the lender's right to demand prepayment—it will always become due as it approximates a provision that simply calls for the automatic payment of prepayment consideration upon acceleration. See id. at 837 (surveying cases where default and acceleration automatically triggers prepayment payments). Put differently, the model clause in Northwestern is not an "evasion" clause designed to protect the lender from the borrower's intentional default and avoidance of the prepayment premium by the exercise of redemption. Instead, the model clause is a penalty provision providing for liquidated damages in the event of a default and

---

[5] Presumably, if the borrower in Northwestern actually attempted to redeem the property following the foreclosure judgment by tendering payment of the entire debt due, the lender would still have a claim to the prepayment fee, under common law, if the lender could establish that the borrower's default was an intentional evasion of the prepayment fee. See Northwestern, 816 N.Y.S.2d at 836.

18

acceleration. Whether by voluntary repayment, the borrower's exercise of the right of redemption, or a foreclosure sale to a third party, the borrower would become obligated to pay the prepayment fee.[6] Section 9.3 is easily distinguishable from the model clause; here, the borrower must first fulfill a condition precedent by actually prepaying the loan.

To extent appellant relies on Northwestern for the proposition that the prepayment consideration that would be triggered upon the borrower's redemption under Section 9.3 should be included in a foreclosure judgment, such reliance is misplaced. Albeit in dicta, the Northwestern court expressly assumed that under circumstances such as here, in which the borrower's redemption triggered the prepayment premium, but the right to redemption had yet to be exercised, the premium would still not be included in a foreclosure judgment. See id. at 839 (noting that where referee's computation of the foreclosure judgment amount preceded the mortgagor's exercise of the equity right of redemption, "the judgment of foreclosure would not include the [prepayment] amount due to lack of 'default and acceleration' as the trigger event"). Because the prepayment provision had not yet and might not ever be triggered, the court in Northwestern suggested that the prepayment premium would not be included in the foreclosure judgment.

Appellant posits the "absurd" hypothetical should the prepayment consideration not be included in the foreclosure judgment: a borrower could redeem his property at the foreclosure sale at the last possible minute pursuant to the foreclosure judgment (by paying the debt owed without the prepayment consideration); at that time, the lender would have to seek an order amending the foreclosure judgment to include the prepayment consideration which had now become triggered, thereby wasting judicial and litigant resources. As the Northwestern court

---

[6] For instance, here, in contrast to the model clause, where a third-party purchases the property in the foreclosure sale—indeed the most likely scenario subsequent to the borrower's default—the Section 9.3 prepayment provision would never be triggered.

notes, however, the rule proposed by appellant—that the hypothetical prepayment consideration should always be included in the foreclosure judgment—would actually yield the "absurd" result and waste resources. The referee in determining the amount of the foreclosure judgment would have to calculate the amount of the prepayment consideration notwithstanding that it may never be triggered. Id. at 839 ("Redemption could occur any time until the sale . . . making recalculation of sums due necessary . . . [and] [a]ny attempt to compute this [prepayment] sum if not triggered would waste judicial and litigant resources."). Under the rule appellant proposes, except in the highly unlikely event that the borrower actually does redeem the property before the foreclosure sale, the referee's determination would either grossly overstate the amount owed the lender or have to be recalculated following the sale. The court finds nothing absurd at all that, in the event the borrower does attempt to redeem his property by tendering payment in satisfaction of the loan prior to the foreclosure sale, the prepayment clause is triggered and the lender may enforce the provision. As the parties have agreed, such action by the borrower would constitute an intentional evasion of the prepayment consideration and would give rise to a claim.

Therefore, to the extent USBNA argues that the prepayment consideration should be deemed a "right to payment" because it would have been included in a judgment of foreclosure, the court finds to the contrary. Because the Loan Documents lacked an unambiguous clause stating that a right to prepayment consideration arises in the event of a default and acceleration, the bankruptcy court correctly disallowed USBNA's claim for prepayment consideration.

20

### III. Conclusion

For the reasons set forth above, the judgment of the bankruptcy court is affirmed.  The

Clerk of Court is directed to enter judgment accordingly.


SO ORDERED.

/s/(ARR)

_____
Allyne R. Ross
United States District Judge

Dated:  January 24, 2012
    Brooklyn, New York